These will be called as previously announced and the times will be as allotted to counsel. The first case today is case number 18-9007, Shiela DeWitt et al. v. Edward T. Stewart, Jr. Thank you. Thanks. Good morning. Could you keep your voice up, please, counsel? Yes. I was also speaking to the mic. Good morning. Thank you. I'm Nancy Michaels. I represent Edward Stewart. I'm with the firm of Parnell, Michaels & McKay and I have with me my associate, David Estimados. So our basic premise to what happened at the bath was that it failed to abide by its standard in finding clear error with the trial court's decision. It took a very detailed and very well-reasoned opinion that said that the debtor should get his discharge and decided the case differently. We all know the standard of review for illegal holdings is de novo and for finding the facts, it's clear error. The bankruptcy code was dealing with objections to discharge and they are to be narrowly construed and fit squarely in the terms of the bankruptcy code. But that actually lacked a sufficient basis for finding that. Well, counsel, this is a fact-intensive case and we don't have much time to argue. Can I suggest to you that you disregard the BAP opinion? Our view is de novo, as you point out, but it is de novo of the bankruptcy court's decision. Correct. So what your focus is going to be is to explain to us why we should find that the bankruptcy court opinion is not infected by either clear error of fact or mistakes of law. And certainly the BAP opinion can be of some assistance in that. But my principal question is whether the bankruptcy court used the correct legal standard in determining what the intent of the debtor was in his actions with the interactions with the homeowners. And if it did not, what the appropriate remedy is, because the BAP apparently felt that the appropriate remedy was to make its own findings along the proper legal standard. Thank you, Your Honor. That's very much where I was going to go to. The bankruptcy opinion was very detailed. It went through all of the six requirements. Both of us agree that as far as false pretenses or misrepresentation, there are six factors that must be considered. The bankruptcy court went through each one of those six factors on basically the evidence that was submitted before it. It relied on testimony of the parties and it relied on the exhibits that were entered. There were multiple exhibits. But the bankruptcy court appears to have given great weight to its conclusion, and I'm going to paraphrase at this point, that it was dealing with a dumb but honest debtor. And as the BAP pointed out, the standard for determining intent, whether we are simply dealing with someone who isn't smart or sophisticated about the issues or someone who has an evil intent, is under our Paumachi decision. It's considerably more nuanced, and there's some doubt in my mind that despite the 44 pages of the BAP opinion, that the BAP really made the serial findings with respect to intent that Paumachi suggests should be made. The trial court definitely relied on Paumachi, but that's where those six things came from. We have known judges to rely on cases without properly applying them. That's what I'm getting at. I think that they did properly apply the six elements. The trial court found that Stewart did not knowingly make any false representations. There were three major representations that the BAP relied on. One was that Mr. Stewart said that his business was bullied. The other one was that the money was going to be used to fund the plan. And the third one was that he was going to be able to leverage the payments that he received. This contract was a milestone contract. Payments were not made according to the amount of money that was spent. A milestone payment was given when at the start of a particular phase of the remodeling. All of those milestones payments, except for the initial first and the last one, were the same amount of money. So they couldn't relate to the cost of it. So here he had a very clear contract that he was getting money as the milestones occurred. There was no evidence. He was getting money as the milestones occurred, but that recitation of the facts overlooks the allegation and the evidence that there was some, shall we say, unusual sequencing of events in order to bring milestones into existence. First of all, with that comment, that was from a Mr. Traffee, who was the contractor that finished the plans. His business was very different from the... I understand that, but there were also facts in your own client's proof that indicate that, that particular phases of the work that one would expect to find completed before a different phase started were incomplete. Now, Mr. Stewart had explanations for some of that, but there was certainly evidence of that. So this isn't the sort of case where the milestones occurred just like natural phenomenon. The milestones themselves were suspect, and that's got to be taken into account in the intent determination. Well, Mr. Traffee's comments could not have gone to the debtor's intent. He just didn't opine on that at all. All he said was that there was mis-sequencing, which may or may not have been true. The evidence said that... But if there was mis-sequencing, that certainly gives a fact finder an insight into what the builder's intent is. It may not be determinative, but it gets back to my question as to whether the bankruptcy court properly considered all of the factors which we, in Palmacci and other decisions, have said ought to be considered in determining a debtor's intent in this sort of situation. But the intent had to be to cause injury to the wits. Yeah. The remodeling business is very different from new construction in that, as Lasard said, things go bump into the night. The electrician said he was going to be there, but he didn't show up, so we get the plumber. It's not like new construction where you really can start with and build up. You're trying to get this job done, and if something that you planned to do couldn't happen, you try to do something else so you can at least keep the project running. In a remodeled job, you don't know what's there, what you're trying to work with. There are walls, they're up with sheetrock and everything else, and you can't necessarily always say, well, you can't do that next job. And there was no evidence put on by the duets as to when there was actually mis-sequencing. The only testimony to that was given by Mr. Trophy. Well, see, I'll go back and check the record, but as I read the record, I think in Mr. Stewart's testimony itself there is some evidence of mis-sequencing. He has explanations. Correct. But that doesn't mean there's not evidence of mis-sequencing. Those explanations, again, go to his credibility. And what we're dealing with here is we've got a bankruptcy judge who's obviously put a lot of time and effort into this case, but my fear is that he may have taken too narrow a view of what was relevant in terms of the intent question. And that's why I'm seeking the help on that, that the bankruptcy judge properly considered the factors that Palmacci told him to consider, indicated he ought to consider on intent. And you're really not giving me much help. I mean, Mr. Stewart's credibility depends in part on the very intent findings. So we can't bootstrap it and we can't say there's no culpable intent because the bankruptcy court found Mr. Stewart generally credible. Right. One of the big factors that the BAP did not really mention much of anything was at the end of this when it was obvious that things were in – there was major trouble within the corporation. Mr. Stewart, one, started trying to find if he could get some financing. And he was going to have to personally guarantee that financing. So it was going to really hurt him if he got that and he wasn't successful. But he was willing to do that. And in addition to that, I think one of the biggest factors about intent in this thing is this $50,000 that he put in from his 401K. What's the state of the evidence as to what he knew when he put that $50,000 in? I understand that money in the Keogh plan would have been exempt. Exempt, correct. All right, in the normal bankruptcy case. Was there any evidence in this record that Mr. Stewart knew that at the time he made the transfer? Because I haven't been able to find it. No, there wasn't anything direct. Well, then how can the bankruptcy judge rely on that? I mean, you and I are trained in the law and we know that, all right? But if there's no evidence that Stewart knew it – How could he have intended to harm the DeWitts? It doesn't go with the idea that he was willing to risk this $50,000. Because if he was facing imminent bankruptcy and thought all his assets were at stake, putting the $50,000 in under those circumstances is different than if he put the $50,000 in knowing that it would otherwise be exempt from bankruptcy. And I don't find that the bankruptcy judge ever made that distinction. Well, for one thing, his wife had gone through a bankruptcy. I mean, there wasn't any specific person. How is that relevant to what he knew about Keogh plans? Well, she had a 401k also, and so he knew that that was exempt. And that's in the record, that she had a 401k? Yes, because her bankruptcy filing was part of the record. Yeah. So, I mean, that's one thing. I didn't think to ask him because I thought it was so obvious that he knew that it was not – he was going to lose that if he had a filing bankruptcy. I mean, he was certainly familiar with the bankruptcy process, only because of his wife. Can I reserve my last minute and a half here? No. Do you have anything else that you would like to add at this time? Not at this time, no. So, before you step back, Judge Torea, do you have additional questions at this point? No, I think we can close. Thank you. Okay. Thank you, counsel. Thank you. May it please the Court, my name is Dan DeShane, and I represent the DeWitts in this matter. We believe that a clear error can be summed up in two major categories. The first would be the fact that the bankruptcy court, Judge Deasy, did not apply the common meaning to the key phrases of this case. The second category of clear error is the intent issue that Judge Selya referenced. Let's take the intent issue, Mr. DeShane. Where he erred in our view, Your Honor. Before you tell me where – well, go ahead. Tell me where he erred in your view. Go ahead. The case law makes clear that in determining whether or not there's an intent to deceive, that the totality of the circumstances need to be looked at. All the evidence. And we believe, especially with respect when you're looking specifically at Mr. Stewart's testimony, that he strings together a number of Mr. Stewart's testimony and makes a series of implausible conclusions based on that testimony, which result in him finding there was no intent. Well, let me tell you what's troubling me here. All right? If the bankruptcy judge, as you say, applied the wrong standard of intent and reached the conclusion that he reached, what troubles me is why the BAP and this court, which is in the same position as the BAP, shouldn't remedy that by saying, as we would say in virtually any other case, Mr. Trial of Fact, you applied the wrong legal standard to this complex set of facts. This is the proper legal standard that you should have applied. Go apply it. And we remand for that purpose. The only time that I'm aware that an appellate court can apply a legal standard itself in the first instance is if the facts, as a matter of law, would permit no other conclusion but that, on the facts of this case, Stewart operated with a malign intent. And I don't think the facts are anywhere near that clear. I think you may have a good point about the standard, but I think the remedy for the misapplication of the standard is to send it back and let the bankruptcy court apply the proper standard. Appellate courts shouldn't be finding facts in the first instance. Well, I think with respect to it, if I could just address, you raised the issue earlier of the missequencing, and we take that as an example. First of all, there is absolutely no factual dispute there was missequencing on this project. As pointed out, Mr. Stewart had some excuses for that. That's true, but there is testimony surrounding missequencing, which Stewart offered an innocent explanation of missequencing, which you and the BAP think is belied by the facts. That's correct. But you can't say that as a matter of law. And it may be so that the bankruptcy judge took too narrow a view when applying the correct Palmacci test that we don't know what the bankruptcy judge would have found had he applied the correct test. But I'm still struggling with the notion of how you can say that an appellate court, whether it be the BAP or this court, can find intent in the first instance, can apply the correct standard and come up with a finding that an evil intent did exist. Your Honor, I believe it can do so by looking at and applying the clear error standard to the facts. No, no, the clear error standard permits us to say that the bankruptcy court's findings should be vacated, vacated. It doesn't permit us to find that the opposite findings should come in. That would require something akin to the directed verdict standard, that no reasonable fact finder could find anything else. And I just, I mean, I'm not as familiar with this record as you and Mr. Stewart's counsel, but I haven't seen anything like that in this record. This record seems to me highly contested, and the one thing that I find certain about this case is that the facts are pretty uncertain, the inferences from the facts. I mean, I think the error in crediting, if I could just finish on the missequencing for a second, Your Honor, with your indulgence. The factual evidence on the missequencing, for example, it was in mid-missequencing. We put on an expert, Mr. Traffee, who testified that the only conceivable conclusion as to how that missequencing occurred was to generate funds. We also had, while Mr. Stewart rendered some explanation, which he claimed to be innocent, the actual project manager, Mr. Lessard, testified that he had been directed by Mr. Stewart to start milestones out of sequence for the purpose of generating project funds to operate the company. Those are all facts. Those are all facts that were recognized at some point by the bankruptcy court, but he gave improper weight, in our view, to Mr. Stewart's testimony, which was, in our view, not credible, that there was some innocent explanation of, oh, we're home remodelers. I think in that situation, the BAP and this court can make a determination that there was clear error with respect to that issue, and you have a record in front of you where you can say that was error, and clearly that's but one example of where there was an intent to defraud and deceive the duets. I don't want to indicate that I agree or disagree with what you just said, but I do want to point out that in addition to the question of intent, which I find considerably troubling, that there are also three or four other issues that the BAP purported to decide, which the bankruptcy court never even voiced an issue on. For example, the alter ego issue. I just don't think that those issues are clear as a matter of law here, and I can think of very few precedents where a trial court overlooks a disputed issue of fact, doesn't make a determination on it, hear the bankruptcy judge say he didn't have to reach those issues, and an appellate court then goes and decides them. That's not my experience as to what the regular practice is as to how litigation evolves. I understand your point, Your Honor. How do you defend what the BAP did on I think there are a total of four of those ancillary issues that the bankruptcy court intentionally said it didn't have to reach, and instead of sending the case back for those issues to be decided, the BAP then goes ahead and decides them all? Yes, and we cited the Guglielmi decision from 1990 from this court, Your Honor, with respect to specifically on the piercing issue, that all of the facts were before the court sufficient to make that determination. There was a comment in the other brief that it's not ipso facto if there's fraud under 523 that it also pierces the corporate bail. That was actually acknowledged by the trial court. There's other facts in the record that were acknowledged in the trial court's decision, such as, for example, Mr. Stewart was the sole shareholder, he was the treasurer, and he was the president. So you think it's enough if an appellate court has all of the facts before it, despite the fact that the issue was one committed to the fact finder, the appellate court can just go ahead and decide it, although the fact finder has reserved it or bypassed it? I mean, we have lots of cases that say that where the facts are undisputed, that if they are susceptible to plausible inferences, competing plausible inferences, that even the trial court can't, for example, grant summary judgment. It has to make factual determinations, credibility determinations, that sort of thing. I understand, Your Honor, and just to be perfectly clear, and I do understand your point, our position is, and I just used that during the limited time, the sequencing is an issue. We don't believe there is a competing plausible interpretation, for example, of that series of facts. We don't believe there was a plausible interpretation of how this project developed. We don't believe there's a plausible interpretation or a plausible dispute with respect to if a homeowner delivers some $377,000 in deposits relative to a specific project that that contractor is able, after saying it will be used on the project, to spend that money in less than a month's time on old debt. So, in other words, you think this record is such that had you moved for it, you could have gotten summary judgment in the bankruptcy court? That's what you're saying. You're saying there are no questions, no genuine issues of material fact, and we're entitled to judgment as a matter of law. I'm saying there is no plausible interpretation. No plausible interpretation, no genuine issue. But you didn't move for summary judgment. You didn't move for a directed verdict at the trial. That is correct. That is correct. In getting back to my limited time left, I did want to address, there was a discussion of milestone payments that came up, and I just want to clarify the record on that. There's a suggestion in the brief, and actually in the underlying Judge Deasy's opinion, that these milestones show that it wasn't just about the project work, and that they were somehow set up in advance and not tied to anything. I want to be very clear that that is not the case. First of all, before the milestone payments are paid, there was a sum in $377,000 that were paid in deposits. A milestone system is then set up for the project, and that is an exhibit in the record. That milestone payment schedule goes from demolition all the way through punch list on the duet project. It is absolutely sequenced out as a normal construction scheduling would be. It is not, as their suggestion is, something like an installment contract, where you pay $100 every month to AT&T for your cell phone bill. Those milestones are not tied to any particular date. They only have to be paid once work begins on that project. Any suggestion that this milestone set up somehow shows that the monies were not related somehow to the duet project, or suggests that they were meant to fund Mr. Stewart's business, is absolutely belied by the record. What triggered the subsequent milestones? The start of work. The start of work of that milestone on the duet project specifically, and that's the only thing. There is reference in the record to this issue of leveraging. Is there a question about whether the milestones were accurately hit, and then moving to the next stage? Did the duets have any opportunity to inspect? Just tell me how it worked. Essentially, Mr. Stewart would come to the duets and say, Just as an example, it doesn't matter, I don't think. Landscaping. Therefore, your milestone payment is due. The duets would rely on Mr. Stewart and say okay, and then they would transfer him the subject funds for that particular trade. As I said, it's actually laid out in the normal project sequencing. The other issue in this case is... So if the landscaping wasn't done... Mr. Stewart would take the position that multiple trades could be started at the same time, and that was a way that he used to generate additional payments. How can you say that the payments were tied to the start of particular aspects of the project when it was clear that they weren't being done? They would be started. Were they being completed? Not always, but some of them, for example, landscaping wouldn't necessarily be in sequence with painting, for example, but they might start both at the same time and not finish them. That's one example of that. I want to go back to a prior point and just ask you one question that I have still sort of lingering. In a case from a bankruptcy court that's gone through the BAP, as I think has been made clear, we look right through the appellate panel's opinion, except to the extent that it is helpful to us. That's just the way the system is set up. Even if we would find the facts differently than the bankruptcy judge, if it is a very close question about whether there was clear error, what would you say we are to do in that instance? I know you think it's not a close question. You say implausible. Really, summary judgment standard applies here and has been met, but I see the clear error standard slightly differently. If we think it is a truly close question upon which reasonable minds might disagree, what should we do in an instance like that? In that case where the record was not clear, I would say a remand would be helpful. Remand? Yes. That's correct, Your Honor. Okay. Judge Torea, do you have additional questions? All right. Very good. Thank you. Thank you both. Thank you, Your Honor.